**William C. TALEN and Farmer's Savings Bank and Trust–Vinton, Appellees,**

v.

**EMPLOYERS MUTUAL CASUALTY COMPANY and Minnesota Fire and Casualty Company, Appellants.**

No. 02–1536.

Supreme Court of Iowa.

Sept. 2, 2005.

Lorraine J. May of Hopkins & Huebner, P.C., Des Moines, for appellant Employers Mutual Casualty Company.

Michael J. Coyle and Norman J. Wang-berg of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, for appellant Minnesota Fire and Casualty Company.

Andrew M. Reidy, Murray D. Sacks, and Cass W. Christenson of McKenna Long & Aldridge LLP, Washington, D.C., and Eugene J. Kopecky of Ackley, Kopecky & Kingery, Cedar Rapids, for appellees.

CARTER, Justice.

Employers Mutual Casualty Company (Employers) and Minnesota Fire and Casualty Company (Minnesota Fire), defendants in the district court, each appeal from a judgment following a bench trial in which the court found that both of these insurers insured plaintiff, William Talen, and that Employers also insured Farmers Savings Bank and Trust of Vinton (Vinton bank) against the costs of defense and resulting settlement of legal liability growing out of litigation commenced by a former employee of the Vinton bank, Duane Pearson. The district court further found that both insurers were guilty of bad faith in not defending against the Pearson claims. As a result of these findings, the district court awarded Talen and the Vinton bank damages for costs of defense not assumed by other insurers, amounts expended to settle the legal liability in the Pearson litigation, and costs and attorney fees in the present action.

After reviewing the record and considering the arguments presented, we conclude that Employers did not act in bad faith in refusing to defend these claims. As a result of policy exclusions, it did not insure either Talen or the Vinton bank against liability or costs of defense in the Pearson litigation and was not liable for the sums awarded against it by the district court. We conclude that the Minnesota Fire policy did insure Talen against at least one of the claims in the Pearson litigation. The

attorney fees incurred in defending the Pearson litigation that were not paid by other insurers were paid by the Vinton bank, a party not insured by Minnesota Fire. Consequently, those fees are not recoverable in the present litigation. We conclude that Minnesota Fire, although obligated to defend Talen, did not act in bad faith in declining coverage. However, under Minnesota law, which is determinative of the issue, Talen is entitled to recover from Minnesota Fire the amount of the actual attorney fees he has incurred in the present litigation. The judgment of the district court is affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.

Talen, a resident of Minnesota, controls the holding company that owns the Vinton bank and a bank in Traer. He is the chairman of the board, president, and CEO of the Vinton bank. On April 10, 1996, Pearson commenced an action against Talen and the Vinton bank. The petition alleged that Pearson had resigned his employment at the Vinton bank pursuant to a written termination agreement that provided as follows:

> Pearson shall fully cooperate with the Bank with regard to any information or actions concerning the Bank's operations of which he has knowledge. Neither party shall disclose the contents of this Agreement nor any circumstances surrounding the resignation, except with the express written consent of the other party. The parties will cooperate in the public disclosures of the resignation and each will present the resignation and subsequent events as positively as possible.

Pearson's petition alleged that the bank and Talen had breached that agreement "by contacting prospective employers of the Plaintiff and by disclosing information

made confidential by the agreement." The petition further alleged that, "[a]s a result of the breaches of contract by Defendants, Plaintiff has lost and has been deprived of opportunities for employment and has suffered monetary damages and loss." The petition prayed for judgment as a result of that alleged loss.

In May 1997 Pearson filed a request for permission to amend his petition to add claims based on slander, tortious interference with a prospective business relationship, and violation of Iowa Code section 730.1 (1995) (prohibiting employers from preventing discharged employees from obtaining other employment by other than an accurate written description of job performance). The district court refused to allow the proposed amendment to Pearson's petition. That ruling proved to be without legal significance, however, because Pearson later filed an independent action raising his additional legal theories, and that action was ultimately consolidated with his original breach-of-contract action.

Talen and the Vinton bank tendered the defense of the Pearson actions to Employers and two other liability insurers, Fidelity and Deposit and Farm Bureau Mutual. In addition, Talen tendered the defense of those actions to Minnesota Fire. Employers' policy insured the Vinton bank against liability for personal injury, as defined in its policy, and insured Talen, as an executive officer of the bank, with respect to his activities as such. Employers declined coverage of Pearson's claims from the outset based on policy exclusions that it deemed applicable. Minnesota Fire, which had issued a business protector policy to Talen, initially indicated that it would defend him under reservation of right, but ultimately elected not to do so. Fidelity and Deposit and Farm Bureau Mutual did share the defense under reservation of right and each contributed to the cost of settling the Pearson actions.

Pearson's claims against Talen and the Vinton bank were ultimately settled for $600,000. Farm Bureau Mutual contributed $125,000 toward the settlement, Fidelity and Deposit contributed $100,000, and Talen personally paid the remaining $375,000. Although Fidelity and Deposit and Farm Bureau Mutual paid a portion of the attorney fees expended in defending the Pearson claims, the Vinton bank was required to contribute $55,628 toward the attorney fees that it and Talen incurred in defending the litigation.

Talen and the Vinton bank commenced the present action against Employers and Minnesota Fire, seeking a declaration that those insurers breached a duty to defend Talen and the bank against Pearson's claims and to satisfy that portion of the settlement that was not paid by Fidelity and Deposit and Farm Bureau Mutual. The petition further asserted that both insurers had acted in bad faith in handling the Pearson claims and sought recovery of attorney fees incurred by the Vinton bank in the Pearson litigation and attorney fees incurred by Vinton bank and Talen in pursuing the present litigation.

The claims of Talen and the Vinton bank against Employers and Minnesota Fire were tried to the court. Because Pearson's claims against Talen and the Vinton bank had been settled, there had been no prior judicial determination of the extent of their liability under any particular legal theory that had been alleged against them. The settlement agreement did not allocate the sum paid to settle these claims to any particular count of the multifaceted claim. Evidence was presented in the present litigation, however, concerning the facts on which Pearson relied. The gist of this evidence was that, after Pearson ceased to be employed at the Vinton bank, another

bank was considering hiring him. That bank, located in Oelwein, inquired of the Vinton bank concerning Pearson's prior employment there. This inquiry was referred to Talen who telephoned both the owner of the Oelwein bank and an executive officer thereof and gave a negative account of Pearson's performance as a loan officer at the Vinton bank. After these conversations, the Oelwein bank's offer of employment to Pearson was withdrawn. These circumstances formed the basis of the claims against Talen and the Vinton bank in the Pearson litigation.

The district court found that both insurers had a duty to defend the Pearson claims and were liable for defense costs not paid by Fidelity and Deposit and Farm Bureau Mutual. The court further concluded that both insurers must indemnify Talen for the amounts that he personally contributed to the settlement. The court also found that both Employers and Minnesota Fire acted in bad faith in their handling of these claims and held them liable for the attorney fees and certain costs incurred by Talen and the Vinton bank in the present litigation. Other facts material to the appeal will be considered in our discussion of the legal issues presented.

## I. *Scope of Review.*

█ The action was tried in equity in the district court. Consequently, our review of both the law and the facts on appeal is de novo. *In re Custer's Estate,* 229 Iowa 1061, 1064, 295 N.W. 848, 851 (1941); Iowa Const. art. V, § 4; Iowa R.App. P. 6.4.

## II. *The Claim Against Employers.*

The claim of Talen and the Vinton bank against Employers is predicated on a general-liability policy issued by Employers insuring the Vinton bank as named insured and executive officers of the bank, such as Talen, to the extent that the claim arises from their performance of duties as a bank officer or director. The Employers policy obligates it to pay those sums the insureds become legally obligated to pay because of "personal injury." "Personal injury" is defined so as to include:

> [I]njury, other than "bodily injury", arising out of . . . :
>
> . . . .
>
> d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> e. Oral or written publication of material that violates a person's right of privacy.

The contract states that the insurance does not apply to:

> "Personal injury"
>
> arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or
>
> for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

An endorsement to the Employers policy provides:

> This insurance does not apply to:
>
> "Personal injury" to:
>
> (1) A person arising out of any:
>
> (a) Refusal to employ that person;
>
> (b) Termination of that person's employment; or
>
> (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation,

harassment, humiliation or discrimination directed at that person. . . .

This exclusion applies:

Whether the insured may be liable as an employer or in any other capacity.

■ A. *The initial breach-of-contract claim.* When Employers was presented with Pearson's initial action, it denied coverage on the ground that the claim was for liability assumed in a contract or agreement. Employers continues to urge that the allegations of that petition in no way presented any claim other than a breach-of-contract action. We agree with this contention.

The gravamen of the claim in Pearson's original petition was an alleged breach of an express written agreement. The alleged injury sustained was described as follows: "As a result of the breaches of contract by Defendants, Plaintiff has lost and has been deprived of opportunities for employment and has suffered monetary damages and loss." The petition prayed for judgment as a result of that loss and for no other reason. Because the liability insurance afforded under Employers' policy did not extend to obligations assumed in a contract or agreement, it had no obligation to defend Talen or the Vinton bank against the original petition filed by Pearson.

■ Talen and the Vinton bank, relying on *Employers Mutual Casualty Co. v. Cedar Rapids Television Co.*, 552 N.W.2d 639 (Iowa 1996), urge that under Iowa law a liability insurer's duty to defend depends on the facts alleged and not the legal theory espoused. This is not entirely correct. Insurance coverage is a contractual matter and is ultimately based on policy provisions. *State Farm Auto. Ins. Co. v. Malcolm*, 259 N.W.2d 833, 835 (Iowa 1977). Insurers may and frequently do extend liability coverage to only specific torts.

We described this practice in *Kibbee v. State Farm Fire & Casualty Co.*, 525 N.W.2d 866 (Iowa 1994), in which we observed:

The policy defines the term "personal injury" in two ways. It lists specific types of damages that are personal injury such as "bodily harm" and "mental anguish." It also lists specific torts— such as "false arrest," "slander" and "assault and battery"—that qualify as personal injury.

*Kibbee*, 525 N.W.2d at 868 (footnote omitted). Employers' policy, at issue here, limits personal-injury coverage to:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entrance into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or

e. Oral or written publication of material that violates a person's right of privacy.

The issue in the *Cedar Rapids Television* case was whether the facts alleging a tortious interference with a contract could implicate liability insurance coverage afforded against a malicious-prosecution claim. A divided court concluded that they could, based, in part, on the following analysis by a leading commentator:

The bulk of the cases involving interference . . . also involved the commission of some independent tort. . . . Thus in many cases interference with contract is not so much a theory of liability in itself

as it is an element of damages resulting from the commission of some other tort. . . .

W. Page Keeton, *Prosser & Keeton on the Law of Torts* ch. 24, § 129, at 992 (5th ed.1984). We choose not to extend the holding of *Cedar Rapids Television* beyond the facts of that case. It is clear in the present case that nothing alleged in Pearson's initial petition implicated any tort claim. It was based entirely on an alleged breach of contract, a type of claim that Employers' policy specifically excluded.

### B. *The tort claims.*

■ 1. *The employment-related-practices exclusion.* Employers concedes that the defamation claim added to the litigation subsequent to the original breach-of-contract action falls within the general coverage provisions for personal injury. However, Employers has contended from the inception of the Pearson litigation that policy exclusions apply that negate any liability coverage for either the bank or Talen with respect to Pearson's defamation claim. One such exclusion is referred to as an "employment related practices" exclusion and has been set forth in full earlier in this opinion. It purports to exclude liability coverage for personal injury to a person arising out of any:

> Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person. . . .

The district court determined that this exclusion did not apply to Pearson's claims because the acts on which those claims were based occurred after his employment with the bank had ended and were not shown to have involved an employment-related policy of the bank. Employers contends that in so ruling the court interpreted the employment-related-practices exclusion much too narrowly and contrary to the manner that it has been applied by other courts. Although Talen and the Vinton bank urge that we adopt the district court's view of this exclusion, we are convinced that Employers presents the more persuasive argument concerning its application.

An example of the application of an employment-related-practices exclusion to a claim for postemployment defamation is found in *Frank & Freedus v. Allstate Insurance Co.*, 45 Cal.App.4th 461, 52 Cal. Rptr.2d 678 (1996). In this case, an insurer had refused to defend its insured in an action by a former employee for wrongful termination and also for defamation occurring after his employment had been terminated. The defamation claim was based on statements relating to the former employee's job performance. The insurer relied on an employment-related-practices exclusion that was in all material respects identical to the exclusion contained in Employers' policy. The trial court determined that the exclusion precluded coverage for the posttermination defamation claim. In affirming, the California appellate court stated:

> We are unpersuaded by Frank and Freedus's argument the exclusionary language is ambiguous. The fact the policy's general definition of the term "personal injury" encompasses defamation does not set up a fatal inconsistency or ambiguity because in another section of the policy [the employment-related-practices exclusion] coverage is excluded for certain personal injuries, including defamation, in a particular context. An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances.

Nor is the term "employment-related" ambiguous because it is not specifically defined in the policy. The term is not technical in nature. It is used in its ordinary sense, i.e., related to employment. As a term, it modifies the specified acts (including defamation) as well as the terms "practices, policies, acts or omissions." The clear meaning of ... the exclusion is coverage for practices, policies, acts or omissions which are related to employment, including employment-related defamation.

The defamation here was clearly employment-related. The statement was made in the context of [the former employee's] employment and its content is directed to [his] performance during employment.

*Frank & Freedus*, 45 Cal.App.4th at 471–72, 52 Cal.Rptr.2d at 684.

A similar application of an employment-related-practices exclusion is found in *Berman v. General Accident Insurance Co. of America*, 176 Misc.2d 13, 671 N.Y.S.2d 619 (N.Y.Sup.Ct.1998). In that case, an insurer had denied coverage when its insured, a veterinarian, was sued by a former employee for alleged postemployment defamation concerning her job performance. The policy contained an exclusion for specified employment-related practices, including defamation. In upholding the insurer's denial of coverage, the court stated:

The plaintiffs' argument that the exclusionary language in the policy must be read as limited to injuries sustained while the employee is still employed is "semantically unreasonable and unacceptable."

*Berman*, 176 Misc.2d at 18, 671 N.Y.S.2d at 623 (citation omitted). The court further concluded that coverage was also precluded because it involved the specified-employment practice of "evaluation," stating:

[The] statements constituted an assessment of Dr. Attas's performance as an employee of the clinic and an explanation of why she was discharged. As such, these statements fall squarely within the policy exclusion for specified employment-related practices such as evaluation and defamation.

*Id.* (citation omitted). The employment-related-practices exclusion contained in Employers' policy included both evaluation and defamation so as to implicate both prongs of the *Berman* holding. Another case in which an identical employment-related-practices exclusion was held to exclude coverage for posttermination defamation is *Capitol Indemnity Corp. v. 1405 Associates, Inc.*, 340 F.3d 547, 550 (8th Cir.2003) (such exclusions bar coverage for virtually any claim arising out of the employment relationship). We find these decisions to be persuasive, and in applying similar principles of interpretation, we are convinced that the defamation claim was excluded from the personal-injury coverage provided in Employers' policy.

■ Although several legal theories were advanced in Pearson's petition, the district court focused exclusively on the defamation claim in determining that Employers' policy provided liability coverage against Pearson's claims. Talen and the Vinton bank now suggest that coverage exists because Pearson's claims also included the torts of invasion of privacy and disparagement. We disagree for several reasons. Neither of those legal theories was identified as such in Pearson's action against Talen and the Vinton bank. The district court did not rely on those theories in its finding that Talen and the Vinton bank were insured under the personal-injury coverage of Employer's policy. Finally, in alleging the personal-injury coverage of Employer's policy in the present

action, Talen and the Vinton bank, in paragraph 25 of their petition, only allege:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

. . . .

(d) *oral or written publication of material that slanders or libels a person.*

(Emphasis added.) Because Talen and the Vinton bank have not shown that they relied on the torts of invasion of privacy and disparagement in seeking to establish insurance coverage in the district court, they may not successfully urge these theories on appeal.

■ Talen and the Vinton bank urge that Iowa law provides a narrower interpretation of the phrase "arising out of," when contained in an insurance policy exclusion, than the interpretation that was employed in the cases upon which we rely. They suggest that, under this court's restrictive interpretation of the words "arising out of" in insurance policy exclusions, the exclusion relied on by Employers does not preclude coverage for Pearson's defamation claim. They base this argument on principles espoused by us in *Tacker v. American Family Mutual Insurance Co.*, 530 N.W.2d 674 (Iowa 1995). In that case, we determined:

When used in the context of a coverage clause, words like "arising out of" must be given a broad, comprehensive meaning. Exclusionary clauses, however, call for a narrow or restrictive construction. Where . . . a claim may be said to derive from two independent causes, (*e.g.*, negligent operation of a motor vehicle and negligent supervision of school children), a policy's exclusion for injuries "arising out of" motor vehicle accidents must be read narrowly to exclude coverage for only those injuries proximately caused by the motor vehicle, not lax supervision.

*Tacker*, 530 N.W.2d at 677 (citations omitted).

Unlike the situation in *Tacker*, Pearson's claims did not potentially arise from two independent causes; they were based entirely on comments that Talen made to officials of the Oelwein bank concerning Pearson's abilities as a loan officer.[1] That conduct was the sole *actus reus* of the alleged torts. This is conduct that is embraced by the policy exclusion on which Employers relies. The necessary causal relationship between the excluded conduct and the claimed injury is self-evident.

■ Talen and the Vinton bank contend that Employers may not avail itself of the employment-related-practices exclusion in the present case because the allegations of Pearson's petition setting forth his defamation claim did not identify what was said in Talen's conversations with the owner and executive officer of the Oelwein bank. The petition only alleged that what was said was disparaging towards Pearson. Thus, Talen and the bank argue, it may not be assumed that the alleged disparagement related to Pearson's performance as an employee of the bank. We have recognized that it is permissible for a liability insurer, in determining whether to accept a tendered defense to consider facts beyond the allegations of the petition.

---

1. The lawyer who represented Talen and the Vinton bank in defending against Pearson's claims testified that his discovery proceedings in that action disclosed that a Vinton bank employee named Darlys Hulme had also spoken to someone at the Oelwein bank concerning Pearson. It does not appear that this conversation constituted a basis for Pearson's claim against the Vinton bank, but to the extent that it may have, Darlys Hulme's communication would have constituted an employment-related practice for the same reasons that Talen's communications did.

*McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984).

In *McAndrews* we stated this principle as follows: "The scope of inquiry, however, must sometimes be expanded beyond the petition, especially under 'notice pleading' petitions which often give few facts upon which to assess an insurer's duty to defend." *Id.* Quoting from an earlier case, we stated that an insurer has no duty to defend "if after construing both the policy in question, the pleadings of the injured party *and any other admissible and relevant facts in the record,* it appears the claim made is not covered by the indemnity insurance contract." *Id.* (quoting *Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)).[2] We find this principle to be especially relevant when the basis for withholding coverage is a policy exclusion the application of which is not readily ascertainable from the allegations of the petition and will not necessarily be determined in the tort litigation. *See Inghram v. Dairyland Mut. Ins. Co.*, 178 N.W.2d 299, 301 (Iowa 1970) (coverage denied based on failure to notify insurer of replacement vehicle).

In the present case, Employers inquired of its insured, the Vinton bank, concerning the relationship between the parties when it was apprised of Pearson's breach-of-contract action. As previously noted, defense of that action was declined due to an exclusion of coverage for liability assumed under a contractual agreement. When Employers was apprised of the later action asserting the tort claims, its knowledge that Pearson had been an employee of the Vinton bank caused the insurer to suspect that the statements constituting the alleged defamation might pertain to Pearson's employment at the bank. It sought to confirm this belief by inquiring of counsel who was defending the Pearson claims on behalf of the Vinton bank and Talen (and who was also the person urging Employers to accept the defense) concerning the nature of the statements that had been made by Talen. No information was provided that suggested the injurious communications involved anything other than comments on Pearson's abilities as a loan officer.[3]

Subsequent inquiries by Employers confirmed that its conclusions as to the nature of Talen's conversations with the Oelwein bank were correct. In considering all of the evidence produced in the present litigation, we are satisfied that Talen's comments to Pearson's prospective employers at the Oelwein bank were entirely related to his performance as a bank loan officer. The fact that Employers may have denied

---

2. We conclude that the reference to "relevant facts in the record" merely means any facts that would be relevant in determining the insurer's duty to defend in later coverage litigation. We expressed this point as follows in *New Hampshire Insurance Co. v. Christy*, 200 N.W.2d 834 (Iowa 1972):

   The allegations in a pleading are not, in all circumstances and situations, the decisive factor in determining whether there exists a duty on the part of the insurance company to defend. This is especially true when the duty to defend depends upon a factual issue which will not be resolved at the trial of the third party's suit against the insured, [in such a situation] the duty to defend may depend upon the actual facts and not upon the allegations in the pleading.

   *Christy*, 200 N.W.2d at 838.

3. Evidence was presented that, in his conversations with the owner and chief executive officer of the Oelwein bank, Talen also stated that he had been told by a bank examiner that Pearson had made a number of bad loans at another bank at which he had been employed. From the context of the conversation, we conclude that this information was given to corroborate Talen's evaluation of Pearson's capabilities as a loan officer. As such, it also falls within the employment-related-practices exclusion.

coverage based on assumptions involving the contents of Talen's conversations prior to obtaining more accurate information with respect thereto is without significance in light of the fact that its assumptions proved to be correct.

■ 2. *The "Refusal to employ" exclusion.* Employers' policy also included an exclusion that provided:

> This insurance does not apply to "personal injury" to
>
> A person arising out of any:
>
> Refusal to employ that person.

■ Insurance policies are contracts between the insurer and the insured and must be interpreted like other contracts, the object being to ascertain the intent of the parties. *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994). The words used should, unless otherwise defined, be given their ordinary meaning to achieve a fair interpretation. *N. Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987). Words in an insurance policy are to be applied to subjects that seem most properly related by context and applicability. *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987).

■ In applying these principles, we are convinced that, although the employment-related-practice exclusion is based on a type of conduct that caused the alleged personal injury, the "Refusal to employ" exclusion is based on a particular consequence befalling the third-party claimant, i.e., a loss of employment.[4] All of Pearson's legal theories sought recovery for damages suffered as a result of the Oelwein bank failing to employ him. That

injury is clearly excluded by the "Refusal to employ" exclusion contained in Employers' policy. Although Pearson's pleaded claims appear to have also included an effort to recover damages for a residual loss of reputation apart from his loss of the Oelwein bank job, this does not aid him. Within the context of the transactions that have been presented in the present litigation, it is impossible to envision any economic damage to reputation that would not be based on a "Refusal to employ."

### III. *The Claim Against Minnesota Fire.*

A. *Claims that may be disposed of without extended discussion.* In considering Minnesota Fire's challenge to the district court's determination that its policy afforded liability coverage to Talen for Pearson's claims, there are several matters that may be disposed of without extended elaboration. We consider these matters briefly.

1. *The breach-of-contract claim.* The district court determined that Minnesota Fire had a duty to defend against Pearson's original breach-of-contract action. Minnesota Fire's policy contained an exclusion for damages assumed by a contract or agreement that was in legal effect the same as the exclusion in Employers' policy. Consequently, as was the case with Employers, the breach-of-contract claim was excluded from liability coverage. Minnesota Fire had no duty to defend Talen against that claim.

2. *Alleged failure to give Minnesota Fire notice of the tort claims.* Minnesota Fire has contended throughout this action that it was not given notice of the tort

---

4. Talen and the Vinton bank urge that this exclusion would only apply to Pearson's loss of employment at the Vinton bank. That interpretation is negated by the language of the exclusion indicating that it applies "[w]hether the insured may be liable as an employer or in any other capacity."

claims contained in Pearson's second action. The evidence presented concerning this issue was conflicting. We are satisfied that a preponderance of the credible evidence supports the district court's finding that Minnesota Fire received adequate notice of the second action and made a considered election to decline coverage with respect thereto.

■ 3. *The consent-to-settle clause.* Minnesota Fire argues that it need not indemnify Talen with respect to the amount he contributed toward the Pearson settlement because its policy provides that any voluntary settlement of a claim without the consent of Minnesota Fire shall be the sole responsibility of the insured. We reject the insurer's effort to invoke that clause in the present case. Our cases are clear that, if an insurer provides liability coverage for a third-party tort claim and declines to defend its insured, it is liable to indemnify the insured for any reasonable settlement of the third-party claim, notwithstanding a consent-to-settle requirement in its policy. *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000) (insurer's unjustified refusal to defend relieves the insured from his or her contract obligations not to settle, and insured is at liberty to make reasonable settlement or compromise without losing rights under the policy); *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 531 (Iowa 1995) (same).

■ 4. *Alleged absence of injury.* Minnesota Fire has contended throughout the litigation that it is not required to indemnify Talen for the amount he contributed to the settlement because he has been reimbursed for that payment by the bank holding company of which he is a majority stockholder. We find no merit in this contention. Pearson's action sought

to collect damages from Talen and the Vinton bank, jointly and severally; Talen and the Vinton bank were the settling parties. Talen wrote a check on his personal account in satisfaction of that portion of the settlement not paid by Fidelity and Deposit and Farm Bureau Mutual. The settlement extinguished Talen's personal liability in the matter. If he was insured for that liability under the Minnesota Fire policy, he is entitled to seek indemnification for the amounts he expended to settle the claim against him.

B. *District court's findings of waiver and estoppel.* The district court's decision purported to disallow Minnesota Fire's policy defenses based on a finding of waiver and estoppel. This conclusion was based on the insurer's initial response to Talen stating that Minnesota Fire would defend the Pearson claims under reservation of right, a decision that it later reversed. On this point, the district court stated:

> Minnesota Fire agreed to handle the defense in May 1996. The court rejects as implausible Minnesota Fire's attempt to characterize its agreement to "handle" the defense as a denial of coverage. Indeed, the very reason for giving an insured notice of claim is to provide the insurer "the opportunity to handle the defense." Minnesota Fire did not fulfill its agreement to defend. Therefore as a result of this breach, Minnesota Fire has waived its right, or is estopped from asserting, coverage defenses.

(Citations omitted.)

■ The district court, accepting Talen's argument that this issue is governed by Minnesota law, relied on a decision of the Minnesota Court of Appeals in support of its finding of waiver and estoppel.[5] Al-

---

**5.** The district court relied on *Home Insurance Co. v. National Union Fire Insurance of Pitts-* *burgh,* 643 N.W.2d 307 (Minn.Ct.App.2002), *rev'd on other grounds,* 658 N.W.2d 522

though we accept the argument that Minnesota law is the most appropriate choice for a dispute between a Minnesota insurance company and a Minnesota resident over a policy sold in Minnesota, our inquiry does not end here. We must ascertain whether in advocating Minnesota law Talen sufficiently pled or proved the foreign law in question. If he did not, our conflicts-of-law rules require us to assume the foreign law is the same as Iowa law. *Pa. Life Ins. Co. v. Simoni*, 641 N.W.2d 807, 811 (Iowa 2002); *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 300 (Iowa 2000). We are unable to discern from the present record that Talen has sufficiently pled and proved the law of Minnesota on this issue or on any other issue in the case, except one that is discussed later. Consequently, we will apply Iowa law in reviewing the district court's finding of waiver and estoppel.

■ In *Scheetz v. IMT Insurance Co.*, 324 N.W.2d 302 (Iowa 1982), we observed:

"[W]e may well keep in mind the somewhat elusive distinction between waiver and estoppel ..., a distinction which appears to be that a 'waiver' is a voluntary relinquishment of a known right, while an 'estoppel' consists of a preclusion which in law prevents a party from alleging or denying a fact in consequence of his own previous act, averment, or denial. Hence, if a party relinquishes a known right, awarded him by contract, he *cannot without the consent of his adversary, reclaim it.* But the

ban of an estoppel may be lifted by the party against whom it is invoked, by the giving of proper notice."

*Scheetz*, 324 N.W.2d at 305 (quoting *Gilbert v. Globe & Rutgers Fire Ins. Co. of New York*, 91 Or. 59, 67, 178 P. 358, 358 (1919)) (citation omitted). In considering Minnesota Fire's initial response to Talen indicating that it would defend the Pearson claims under reservation of right, we can discern nothing in that communication that suggests a waiver of policy defenses. The purpose of declaring an intention to defend under reservation of rights is to preserve those defenses and not waive them by the action that the insurer thereafter takes. *Inghram*, 178 N.W.2d at 304 (as a result of nonwaiver agreement, it is obvious insurer did not covenant to defend or indemnify). Minnesota Fire did not voluntarily relinquish a known right with respect to its policy defenses and those defenses may not be denied on the basis of waiver.

■ With regard to estoppel, we have recognized that, when an insurer gives prompt notice to the party claiming to be insured that it is not waiving the benefit of any policy defenses, no estoppel arises. *Id.; N.W. Nat'l Ins. Co. v. Kinney*, 444 N.W.2d 107, 110 (Iowa Ct.App.1989).[6] The tentative nature of Minnesota Fire's response to the request that it assume the defense did not give rise to any obligation on its part to do so.

■ C. *Limitations as to who is insured.* The insured under the Minnesota

(Minn.2003), to support its conclusion that, by indicating an intention to defend under reservation of right, Minnesota Fire bound itself to do so. The cited case does not support that conclusion. The duty to defend that was established by the Minnesota appellate court was based on an interpretation of the insurance policy and not on a theory of waiver or estoppel.

6. Iowa law provides that estoppel may not operate to create a new insurance contract, although it may deny legal effect to certain requirements imposed against the insured as a condition of obtaining the benefits that the policy confers. *Midwest Office Tech., Inc. v. Am. Alliance Ins. Co.*, 437 N.W.2d 555, 558 (Iowa 1989); *Richardson v. Iowa State Traveling Men's Ass'n*, 228 Iowa 319, 328, 291 N.W. 408, 412 (1940).

Fire policy, as stated on the declaration page, is:

TALEN INVESTMENTS

WILLIAM TALEN DBA

PO BOX 535

NORTHFIELD MN 55057

In describing who is insured, the policy states:

If you are designated in the Declarations as:

An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

In describing the business being carried on, the policy states "INVESTMENT/FINANCIAL ADVISOR." This corresponds to the manner in which the type of business was described in William Talen's application for the business protector insurance policy. The application also disclosed the following information:

1. a recital that gross sales for the previous year were $130,000.

2. a statement that the business would be carried out in Talen's personal residence.

3. an assurance that no customers would be coming on the insured premises (a requirement for insuring a personal dwelling against extended perils in a business policy in lieu of homeowner's insurance).

4. a recital that the insured had been in business for forty-five years.

The application sought a "business liability" limit of $1,000,000, and the policy was issued with that limit in place.

Minnesota Fire does not dispute that the defamation claim asserted against Talen in the Pearson litigation fell within the personal-injury coverage of its policy, which was in all material respects the same as that contained in the Employers' policy

that we have previously discussed. Minnesota Fire, however, asserts that Talen's liability, if any, in the Pearson litigation was unrelated to any solely owned business in which he was engaged and therefore not within the coverage afforded. In this regard, Minnesota Fire points out that the Vinton bank was not owned by Talen. It was owned by a holding company in which Talen owned a controlling interest but less than all of the stock that had been issued.

The district court found that

the Minnesota Fire policy insures Mr. Talen, individually, for specified injuries or damage (*i.e.*, personal injury) arising out of his business activities. Mr. Talen uses the term "Talen Investments" to describe his investing activities.

The court went on to state in its decision that

Minnesota Fire's denial rests primarily on its contention that Mr. Pearson did not sue Mr. Talen in his individual insured capacity.... Mr. Casey, Minnesota Fire's claim supervisor, admitted that he does not know what activities constitute "Talen Investments." Mr. Valen [a Minnesota Fire claims representative] agreed that the description of "Talen Investments" on the declarations page as "Investment/Financial Advisor" is inconclusive and does not specify or limit the scope of the insurance coverage provided. Further, Mr. Valen did not ascertain precisely in what capacity Mr. Talen acted regarding his telephone calls.

The purpose of naming the insured on the declarations page "is to designate the person intended to be insured, any designation which fulfills that purpose is sufficient." 3 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 40:3, at 45 (2000) (footnote omitted). As a leading text suggests:

[W]hen the intent to cover a particular risk is clear, the name of the insured is not always important. Where a designation is not clear on its face, it will be interpreted in such manner as makes the most sense given the context in which it is used, and ambiguities will be resolved against the insurer.

*Id.* (footnotes omitted). The issue before us does not present a question concerning the identity of the insured. Clearly, it is William Talen, individually.[7] The issue over the insuring clause involves the insurer's attempt to use the definition of who is insured to limit the source of the liability that the policy covers.

Pearson's claims against Talen were, in each instance, based on conduct alleged to have been taken both individually and as an agent of the Vinton bank. Minnesota Fire does not insure the Vinton bank or its officers and employees acting in the conduct of banking business. It argues that Talen's communications to the Oelwein bank were taken in his capacity as an agent of the Vinton bank responding to a specific request for information that had been directed to the Vinton bank. Although it is true that the Oelwein bank's request for information was directed to the Vinton bank, Talen's communication was not made to the party at the Oelwein bank that requested the information. Instead, he undertook to contact Carl Pohlad, an acquaintance and business associate, who owned the Oelwein bank. He was communicating information that the Vinton bank was contractually bound not to discuss. His action in that regard did not benefit the Vinton bank, and served to place it at substantial risk of a costly lawsuit. We may and do infer from these circumstances that Talen's communications to officials at the Oelwein bank concerning Pearson's job performance were intended to satisfy his

own business objectives separate from those of the Vinton bank.

We must resolve two questions. Was Talen acting, at least in part, for business reasons in communicating with Pohlad and the Oelwein bank concerning Pearson's abilities or lack thereof; and, if so, was Talen's business pursuit undertaken in connection with a business solely owned by him? We are convinced that the answer to the first question is yes. It is apparent from the evidence presented that Talen was motivated by a wish to remain in the good graces of Mr. Pohlad, the owner of the Oelwein bank, who had been a confidante and advisor with respect to Talen's actions in the buying and selling of banks. This relationship had led to a strong friendship and social interaction between Talen and Pohlad and their respective families that was punctuated, at least once a year, by the delivery of a jar of Mrs. Talen's finest bread-and-butter pickles to their fellow Minnesotans, the Pohlads. But, the cultivation of Pohlad also served a substantial business purpose for Talen.

With respect to the second question, as the district court found, Minnesota Fire's own claim representative conceded that the designation of the character of Talen's business as "INVESTMENT/FINANCIAL ADVISOR" is inconclusive and does not specify or limit the scope of the insurance provided. We agree with that conclusion. It appears from the record that one of Talen's principal business activities was the buying and selling of banks. Although the ownership of some of those banks was eventually placed in a bank holding company, this does not negate the possibility that his actions in acquiring the banks were undertaken in his individual capacity as an investor. The evidence revealed that Mr. Pohlad was a valued advisor with respect

---

7. Although Talen's wife is also an insured, she   is not involved in the present dispute.

to Talen's activities in the buying and selling of banks. Viewing the evidence in its entirety, we find on our de novo review that Talen's conversations with Pohlad and other personnel at the Oelwein bank were undertaken pursuant to the conduct of a business of which he was the sole owner and thus were afforded protection against liability under Minnesota Fire's policy. The fact that he paid the additional money required to settle Pearson's claims, rather than directing the Vinton bank to do so, serves to reinforce that conclusion.[8]

■ Minnesota Fire urges that, if this was a personal business activity of Talen, it did not fall within the activities described in the policy application and, consequently, is not covered by its policy. It seeks to portray the covered business activities as the giving of financial advice and nothing more. We do not view the extent of the covered business activities this narrowly. The words "INVESTMENT/FINANCIAL ADVISOR" are just as easily interpreted to mean that the business relates to both investing and the giving of financial advice. The meaning of the word "investment" is sufficiently broad as to include nearly any activity in which money is invested for financial gain.[9] Single-owner proprietorships may engage in many activities with which their liability insurers are not familiar, but if a particular activity is not excluded by the policy, it may be within the coverage that is afforded the insured. This situation was described by the North Dakota Supreme Court:

> Because we have concluded that Edwin Carlson is the named insured under the policy, it is irrelevant that he did not advise [the insurer] of his purchase of [an additional business] named Harrington Ranch.... Absent a specific exclusion limiting coverage, all of Carlson's business enterprises operated as sole proprietorships were covered by the ... policy.

*Carlson v. Doekson Gross, Inc.,* 372 N.W.2d 902, 907 (N.D.1985). We reach a similar conclusion concerning Talen's activities in the present case.

In reaching this conclusion, we have not overlooked two decisions relied on by Minnesota Fire. In *Rayburn v. MSI Insurance Co.,* 240 Wis.2d 745, 624 N.W.2d 878 (Ct.App.2000), had a policy that, like the Minnesota Fire policy, purported to only make him an insured with respect to the conduct of a business of which you are the sole owner. The insured, who operated a residential carpentry business as a sole proprietorship, helped his father build a shed in his spare time. The court held that conduct was a personal pursuit in which he was not carrying on his carpentry business. The facts of the *Rayburn* case are easily distinguishable from the present case. *Rayburn* was not an instance in which the personal nature of the services performed overshadowed a business purpose; there simply was no business purpose in the insured's activities in that case.

Another case relied on by Minnesota Fire is *Dome Corp. v. Kennard,* 172 F.3d 1278 (10th Cir.1999). The insured in *Kennard* also had a policy in which he was only named as an insured with respect to the conduct of a business of which he was the sole owner. The court held that no

---

**8.** Talen presented expert testimony that attempted to link the amount he paid in settlement to the defamation claim. The district court did allocate the amount paid to that claim, and Minnesota Fire has not challenged that determination in its argument.

**9.** A leading dictionary defines "investment" as "An expenditure to acquire property or assets to produce revenue." Black's Law Dictionary 831 (7th ed.2001).

coverage existed because the liability of the insured arose out of his activities in an oil and gas venture of which he was not the sole owner. *Kennard,* 172 F.3d at 1283. That case did not determine that, if the insured had been acting for his own for business purposes separate and apart from those of his oil-and-gas-venture interests, his actions would not have been covered by the policy.

■ D. *The other insurance clause.* Minnesota Fire contends that it is not liable to indemnify Talen with respect to the settlement of the Pearson action because its policy provides:

> If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.

Minnesota Fire asserts that, because the Fidelity and Deposit and Farm Bureau Mutual policies each had liability limits of $1,000,000, and the insurance afforded by Minnesota Fire was excess over those amounts, it is entitled to a credit of $2,000,000 with respect to its obligation to indemnify Talen. The district court rejected this contention.

The premise on which Minnesota Fire's argument is based is stated as follows in a leading insurance text:

> [I]f an insured settles with a primary insurer for less than that insurer's policy limits, an excess insurer will, *assuming the primary insurer did, in fact, provide coverage,* be entitled to a credit for the full amount of the primary insurance. The insured, therefore, may not recover the difference between the settlement amount and the primary coverage limit from the excess insurer.

1 Allan D. Windt, *Insurance Claims & Disputes* § 6.32 (4th ed.2005) (emphasis added) (citations omitted). The principle thus announced has been recognized and applied by several courts. *E.g., Great W. Cas. Co. v. Canal Ins. Co.,* 901 F.2d 1525, 1527 (10th Cir.1990); *Siligato v. Welch,* 607 F.Supp. 743, 747 (D.Conn.1985); *Smit v. State Farm Mut. Auto. Ins. Co.,* 207 Mich.App. 674, 525 N.W.2d 528, 533 (1994); *Pub. Serv. Mut. Ins. Co. v. Fireman's Fund Am. Ins. Co.,* 82 A.D.2d 403, 404, 441 N.Y.S.2d 677, 678 (1981).

For our present purposes, the key words of the black-letter principle that we have quoted from the insurance text are "assuming the primary insurer did, in fact, provide coverage." We may not assume that either the Fidelity and Deposit policy or the Farm Bureau Mutual policy actually insured Talen against the liability embraced by the Minnesota Fire policy. The coverage of the other policies was a matter that Minnesota Fire was required to establish to the court's satisfaction in order to attain its alleged status as an excess insurer. It has done little to meet that burden. Although it raised the excess-insurance issue in a motion for summary judgment, placed the Fidelity and Deposit policy and the Farm Bureau Mutual policy in evidence at trial, and submitted proposed findings that would have established its status as an excess insurer, Minnesota Fire has made no argument either here or in its brief in the district court asserting a legal theory on which the court might find that these policies, or either of them, insured Talen against the claims that Pearson lodged against him, individually.

Although Fidelity and Deposit and Farm Bureau Mutual each defended Talen against the Pearson claims under reservation of right, both of those insurers denied coverage throughout that litigation. The fact that they each contributed a sum of money to the settlement does not establish that their respective policies in fact cov-

ered the liability claims so as to make the policy limits available to Talen. There is good reason to conclude that these policies did not cover his liability.

The insured under the Fidelity and Deposit policy was a bank in Traer, Iowa, owned by the same holding company that owned the Vinton bank. That policy insured the Traer bank and its officers and directors while acting for that bank. Minnesota Fire has not suggested how the Traer bank was in any manner involved in the Pearson litigation. Farm Bureau Mutual insured the holding company that owned the Vinton bank. It, too, would appear to insure a nonparty to the Pearson litigation.

It is not necessary, however, to base our determination of the inapplicability of the Fidelity and Deposit and Farm Bureau Mutual policies on whom they insured. Both of these policies contained the same employment-related-practices exclusion that we have held excluded coverage on the part of Employers. In the face of that circumstance and without any argument by Minnesota Fire revealing the theory by which it contends these policies provided coverage to Talen, we must reject the argument that it has the status of an excess insurer.

## IV. *The Cross–Appeal.*

Talen and the Vinton bank cross-appeal from the district court's judgment seeking to recover punitive damages from both insurers. Our decision relieving Employers from any liability forecloses an award of punitive damages against it. With respect to Minnesota Fire, we have reviewed its conduct and conclude that the district court correctly determined that this conduct did not warrant an award of punitive damages. The district court's judgment is affirmed on this issue.

## V. *The Attorney Fees Awarded.*

█ The district court ordered an award of attorney fees against Minnesota Fire for the amounts paid by the Vinton bank in defending against Pearson's claims. Because Minnesota Fire does not insure the Vinton bank, this was error. There has been no showing that Talen personally paid any portion of the fees incurred in defending Pearson's claims. Consequently, no fee award with respect to that litigation may be forthcoming from Minnesota Fire.

█ Because the role in which Talen was acting was an issue of disputed fact, we are satisfied that Minnesota Fire may not be found guilty of bad faith in refusing to defend against the Pearson claims. *Bellville v. Farm Bureau Ins. Co.,* 702 N.W.2d 468, 474 (Iowa 2005); *Wetherbee v. Econ. Fire & Cas. Co.,* 508 N.W.2d 657, 661–62 (Iowa 1993). However, under Minnesota law, which was adequately pleaded and proved in this action, Minnesota Fire is liable for the attorney fees incurred by Talen in pursuing the present action irrespective of the absence of bad faith. *Meadowbrook, Inc. v. Tower Ins. Co.,* 559 N.W.2d 411, 420 (Minn.1997); *Am. Standard Ins. Co. v. Le,* 551 N.W.2d 923, 926 (Minn.1996); *Morrison v. Swenson,* 274 Minn. 127, 142 N.W.2d 640, 647 (1966). It is clear, however, that the Minnesota Supreme Court, in so holding, has limited the amount of attorney fees that may be recovered to "whatever expense he [the insured] has been compelled to incur in asserting his rights." *Morrison,* 142 N.W.2d at 647; *accord Le,* 551 N.W.2d at 926. This means that Talen may only seek reimbursement of the actual amount of attorney fees and reasonable and necessary litigation expenses paid or incurred in pursuing the present litigation.

The district court computed Talen's attorney-fee award on an hourly basis for all

of the hours expended in the litigation. In fact, Talen and his attorneys in the present litigation had entered into a contractual arrangement in which Talen was billed and paid fees at an hourly rate up to a certain point and thereafter a contingent-fee arrangement was in effect. The district court's attorney-fee award is vacated and the case remanded for a computation of the attorney fees and reasonable and necessary litigation expenses for which Talen is made responsible under the existing attorney-fee agreement with his counsel. The recovery of fees from Minnesota Fire shall be limited to those amounts.

### VI. *The Bills of Costs.*

The district court approved and entered judgment for two bills of costs that contained items not recoverable as costs or witness fees under Iowa law. We vacate these cost awards. On remand, the taxation of costs shall be limited to those costs taxed by the clerk, witness fees as provided in Iowa Code section 622.69 (2003), expert-witness fees as provided in Iowa Code section 625.14, and the costs of depositions entered into evidence at the trial of the case. This disposition is not intended to preclude the recovery of some of the items contained in the bills of costs as necessary litigation expenses under Talen's fee agreement with his attorneys. The extent to which any item contained in the bills of costs may fall within that category of litigation expenses must be determined by the district court on remand.

We have considered all issues presented and conclude that the judgment of the district court should be reversed with respect to defendant Employers and the case remanded for entry of judgment dismissing plaintiffs' petition against that defendant. The judgment in favor of Talen against defendant Minnesota Fire for indemnification in the sum of $375,000 is affirmed. The attorney-fee and cost judgments entered by the district court are vacated and those matters are remanded for further proceedings in conformance with this opinion. Costs of appeal are taxed sixty-five percent to plaintiffs and thirty-five percent to defendant Minnesota Fire.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**